UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

            Plaintiff,

        - against -

MARTIN SHKRELI;
EVAN GREEBEL;
MSMB CAPITAL MANAGEMENT LLC; and
MSMB HEALTHCARE MANAGEMENT LLC,

            Defendants.
-----------------------------------------X

**MEMORANDUM & ORDER**

15-CV-7175 (KAM) (JRC)

**MATSUMOTO, United States District Judge:**

        In this civil action, commenced on December 17, 2015, the Securities and Exchange Commission ("SEC") alleges that defendants Martin Shkreli ("Mr. Shkreli") and Evan Greebel ("Mr. Greebel") participated in multiple fraudulent schemes in violation of this country's securities laws.  (ECF No. 1, Compl.)  The conduct at issue in the SEC's complaint was also the basis for criminal charges against Mr. Shkreli in the parallel proceeding before this Court, *United States v. Shkreli and Greebel*, No. 15-cr-637 (KAM) (E.D.N.Y.).  Presently before the Court is the SEC's motion to permanently bar Mr. Shkreli from serving as an officer or director of any public company, and for the imposition of civil monetary penalties against him.  For the reasons stated herein, the SEC's motion is GRANTED in its entirety.

**BACKGROUND**

## I.   Procedural Background

Following the Court's granting of the Government's motion seeking intervention and stay (*see* ECF No. 33, Mar. 22, 2016 Mem. and Order), Mr. Shkreli consented to a bifurcated resolution of the instant action.   As part of that bifurcated resolution, on December 28, 2020, the Court entered a consent judgment ("Consent Judgment") which ordered injunctive relief, and provided that the SEC's claims for monetary penalties and an officer and director bar would be decided on motion of the SEC. (*See* ECF Nos. 45, 45-1, Consent J. as to Martin Shkreli, Dec. 28, 2020.)

On April 2, 2021, the SEC filed a Motion for an Officer and Director Bar and Civil Monetary Penalties as to Mr. Shkreli. (ECF No. 48, Letter Enclosing Motion, ECF No. 48-1, Notice of Motion.)   The SEC moves the Court to (1) permanently bar Shkreli from serving as an officer or director of any public company; and, (2) impose civil monetary penalties in the amount of $1,392,000 against him.   (*Id.*)   In support of its Motion, the SEC filed a memorandum of law, the declaration of Melissa Coppola, and a proposed final judgment.   (ECF No. 48-2, SEC Memorandum of Law in Support ("SEC Mem."); ECF No. 48-3, Declaration of Melissa A. Coppola ("Coppola Decl."); ECF No. 48-4, Proposed Final Judgment.) Also on April 2, 2021, Mr. Shkreli filed a memorandum in opposition

2

to the SEC's Motion (ECF No. 49, Def. Opp. Mem.), and the SEC filed a reply in support of its Motion.  (ECF No. 50, SEC Reply.)  On April 7, 2021, Mr. Shkreli filed a letter seeking leave to file a sur-reply.  (ECF No. 52, Def. Letter.)  The Court granted Mr. Shkreli leave to file a sur-reply on April 8, 2021.  (Dkt. Order, Apr. 8, 2021.)  Mr. Shkreli filed a sur-reply in opposition on April 9, 2021.  (ECF No. 53, Def. Sur-Reply.)

Pursuant to the terms of the Consent Judgment, in connection with the instant motion, Mr. Shkreli is precluded from arguing he did not violate the securities laws, and the allegations in the complaint are to be accepted by the Court as true.  (ECF No. 45-1, pp. 2-3.)  Additionally, the Consent Judgment provided that the Court may decide the issues raised in the SEC's motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence, without regard to the standards for summary judgment contained in Rule 56(c) of the Federal Rules of Civil Procedure.  (*Id.*)

## II.  Factual Background

The Court assumes familiarity with the factual background in this case, and incorporates by cross-reference in its entirety the background as provided in the Court's March 22, 2016, Memorandum and Order.  (ECF No. 33, Mar. 22, 2016 Mem. and Order.)  As noted *supra*, pursuant to the terms of the Consent Judgment, all allegations in the Complaint shall be deemed and

accepted as true by the Court for the purposes of this Memorandum and Order.

By way of brief factual background, Mr. Shkreli was the founder and portfolio manager of two hedge funds, MSMB Capital Management LP ("MSMB") and MSMB Healthcare LP ("MSMB Healthcare"). (*See* Compl. at ¶¶ 2, 13, 17-18.)  Mr. Shkreli was also the managing member of the respective investment advisers to the two hedge funds, defendants MSMB Capital Management LLC ("MSMB Adviser") and MSMB Healthcare Management LLC ("MSMB Healthcare Adviser").  (*Id.* at ¶¶ 2, 13, 15-16.)  In March 2011, Mr. Shkreli founded the biopharmaceutical company Retrophin LLC, which became public in December 2012 as Retrophin, Inc. ("Retrophin"). (*Id.* ¶¶ 2, 13, 22.)[1] As will be discussed in greater detail *infra*, the Complaint alleges that Mr. Shkreli: (1) made material misrepresentations and omissions to investors and prospective investors in MSMB; (ii) lied to an MSMB executing broker about MSMB's ability to settle short sales that Mr. Shkreli made in MSMB's account; (iii) misappropriated funds from MSMB and MSMB Healthcare; and (iv) fraudulently induced Retrophin to enter into sham consulting agreements with certain disgruntled investors in MSMB and MSMB Healthcare to settle potential claims against himself. (*Id.* ¶¶ 2-3, 24-55.)

---

[1] After he left Retrophin, Mr. Shkreli became CEO of Turing Pharmaceuticals (now known as Vyera Pharmaceuticals), a privately held company founded by Mr. Shkreli. (*Id.* ¶ 13.)

## LEGAL STANDARDS

I. **Officer Director Bar**

 A. **Securities Act, Exchange Act, and Sarbanes-Oxley Act**

  For violations of the Securities Act Section 20(e), Title 15 U.S.C. Section 77t(e), and Exchange Act Section 21(d)(2), Title 15 U.S.C. Section 78u(d)(2), courts may bar a person from serving as an officer or director of "any issuer that has a class of securities registered" under Exchange Act Section 12, Title 15 U.S.C. Section 78l, or "that is required to file reports" under Exchange Act Section 15(d), Title 15 U.S.C. Section 78o(d).  The Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), Pub. L. 107-204, 116 Stat. 745 enacted July 30, 2002, permits courts to impose an officer and director bar on an individual if a person's conduct demonstrated "unfitness" to serve in such a capacity.

 B. **Unfitness**

  Although Sarbanes-Oxley amended Exchange Act Section 21(d)(2), 15 U.S.C. Section 78u(d)(2), and Securities Act Section 20(e), Title 15 U.S.C. Section 77t(e) to reduce the Commission's burden of proof from "substantial unfitness" to "unfitness," the Court will consider the six non-exclusive factors previously identified by the Second Circuit in *SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995), in evaluating Mr. Shkreli's unfitness to serve as an officer or director of a public company.  In *Patel*, the Second Circuit highlighted several non-exclusive and non-mandatory

factors that are relevant to determining whether a defendant was "substantially unfit" to serve as an officer or director of a public company:

> (1) the "egregiousness" of the underlying securities law violation; (2) the defendant's "repeat offender" status; (3) the defendant's "role" or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.

*Patel*, 61 F.3d at 141.  The Second Circuit in *Patel* was confronted with the earlier version of Section 21(d)(2) of the Exchange Act ("Section 21(d)(2)"), which permitted a ban only "'if the person's conduct demonstrates substantial unfitness to serve as an officer or director.'"  *S.E.C. v. Bankosky*, 716 F.3d 45, 48 (2d Cir. 2013). In 2002, Congress replaced the phrase "*substantial* unfitness" in Section 21(d)(2) with the term "unfitness."  *See* Sarbanes–Oxley Act of 2002 § 305(a), Pub. L. No. 107–204, 116 Stat. 745, 778–79 (2002) (amending 15 U.S.C. § 78u(d)(2)) (emphasis added). Congress's intent in removing the term "substantial" from Section 21(d)(2) was to lower the threshold of misconduct to "unfitness" for which courts may impose director and officer bans.  *Bankosky*, 716 F.3d at 48 (citing S.Rep. No. 107–205, at 27 (2002), available at 2002 WL 1443523 (explaining that standard was changed to "unfitness" because "'substantial unfitness' standard ... [was] inordinately high, causing courts to refrain from imposing bars even in cases of egregious misconduct")).

The Second Circuit in *Bankosky* clarified that though *Patel*, decided in 1995, predated Congress's amendment of Section 21(d)(2), the Patel factors are still just as relevant to determining "unfitness" as they were to determining "substantial unfitness." *Bankosky*, 716 F.3d at 48–49 (citing *SEC v. iShopNoMarkup.com, Inc.*, No. 04-cv-4057 (DRH) (ARL), 2012 WL 716928, at *3 n. 2 (E.D.N.Y. Mar. 3, 2012); *SEC v. Miller*, 744 F.Supp.2d 1325, 1347 (N.D.Ga.2010); *SEC v. DiBella*, No. 3:04-cv-1342, 2008 WL 6965807, at *9 n. 12 (D. Conn. Mar. 13, 2008)).

The *Patel* factors, though helpful guidance, are not mandatory. *Bankosky*, 716 F.3d at 48. A court applying the *Patel* factors may impose an officer or director bar even if not all six factors are present. *See Patel*, 61 F.3d at 142 ("[I]t is not essential for a lifetime ban that there be past violations"). A district court may determine that some *Patel* factors are inapplicable and apply other relevant factors. *Bankosky*, 716 F.3d at 48. The Court enjoys "substantial discretion" in deciding whether to impose a bar and the duration of any bar, "so long as any bar imposed is accompanied with some indication of the factual support for each factor that is relied upon." *Id*. (citing *Patel*, 61 F.3d at 141).

## II. Civil Monetary Penalties

Pursuant to Securities Act Section 20(d), Title 15 U.S.C. Section 77t(d), Exchange Act Section 21(d)(3), Title 15

U.S.C. Section 78u(d)(3), and Section 209(e) of the Investment Advisers Act of 1940, Title 15 U.S.C. Section 80b-9(e), Court may order a civil monetary penalty and, if so, determine the amount of the civil penalty.

Securities Act Section 20(d), Exchange Act Section 21(d)(3), and Advisers Act Section 209(e) each provide three tiers of monetary penalties for statutory violations. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e). "The amount of the penalty shall be determined by the court in light of the facts and circumstances." *See, e.g.*, 15 U.S.C.A. § 77t(d). A first tier penalty may be imposed for any violation; a second tier penalty may be imposed if the violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third tier penalty may be imposed if the violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the violation also resulted in "substantial losses or created a significant risk of substantial losses to other persons." *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3); 15 U.S.C. § 80b-9(e). The statutes provide that, for all three tiers, the amount of the penalty that the Court can impose, per violation, "shall not exceed the greater of" the current statutory amount in effect at the time of the violation, *or* the "gross amount of pecuniary gain to such defendant." *Id*. (emphasis added.) Here, the third-tier statutory amount in effect

8

during the years of Mr. Shkreli's violations involving misappropriations from MSMB and misrepresentations to MSMB and Executing Broker was $150,000.[2]  The third-tier statutory amount in effect during the years of Mr. Shkreli's violations involving Retrophin was $160,000.[3]  The gross amount of pecuniary gain from his misappropriations is $932,000.  (ECF No. 48-2, SEC Mem., p. 14.)

## DISCUSSION

### I.   Unfitness to Serve as an Officer or Director of a Public Company Resulting in a Permanent Bar

The SEC argues that the imposition of a permanent bar preventing Mr. Shkreli from ever again serving as an officer or director of any public company is appropriate.  Mr. Shkreli argues in opposition that a permanent bar would be "excessive," and proposes a ten-year bar or, in the alternative, a ten-year bar along with conditions on any future service as an officer or director of a public company.  (ECF No. 49, Def. Mem. in Opp., at pp. 1-2.)  For the reasons described *infra*, after reviewing the record and considering all factors the Court considers applicable

---

[2] *See* Adjustments to Civil Monetary Penalty Amounts, Release Nos. 33-9009, 34-59449, IA-2845, dated Feb. 25, 2009 (effective Mar. 3, 2009), previously found at 17 CFR 201.1004 and Table IV to Subpart E of Part 201 (available at: https://www.sec.gov/rules/final/2009/33-9009.pdf) and Release Nos. 33-9387, 34-68994, IA-3557, dated Feb. 27, 2013 (effective Mar. 5, 2013), previously found at 17 CFR 201.1005 and Table V to Subpart E of Part 201 (available at: https://www.sec.gov/rules/final/2013/33-9387.pdf).
[3] *Id.*

to Mr. Shkreli's case, the Court finds that a permanent bar is appropriate.

A. <u>Egregiousness of Underlying Securities Law Violation</u>

The Court considers Mr. Shkreli's violations of securities laws to be particularly egregious.[4]  Indeed, Mr. Shkreli himself "appreciates this factor will not cut in his favor." (ECF No. 49, Def. Opp. Mem., p. 7.)  Pursuant to the terms of the Consent Judgment entered in this action, it is undisputed that over several years, Mr. Shkreli engaged in multiple violations, and aided and abetted violations, of multiple antifraud provisions of the securities laws: Securities Act Section 17(a), Exchange Act Section 10(b) and Rules 10b-5 and 10b-21, and Advisers Act Section 206 and Rule 206(4)-8.  (Compl. ¶ 4; ECF No. 45-1, Consent J., p. 2.)  Specifically, Mr. Shkreli (1) repeatedly made material misrepresentations and omissions to multiple investors and

---

[4] Though not part of the allegations in the Complaint in the instant action, the Court takes judicial notice that in 2020, the FTC, the State of New York, and other states, brought an action against Mr. Shkreli and others. The complaint in that action alleged anticompetitive conduct and unfair methods of competition regarding Mr. Shkreli and his co-defendants' attempt to monopolize the drug Daraprim, an essential drug in the treatment of deadly parasitic infections, including in pregnant women, cancer patients and AIDS patients. (*See generally FTC v. Vyera Pharm., LLC*, Dkt. No. 20-cv-706 (DLC) (S.D.N.Y.), ECF No. 86, Apr. 14, 2020, Redacted Amended Complaint for Injunctive and Other Equitable Relief.) Mr. Shkreli was the CEO of the pharmaceutical company, now known as Vyera Pharmaceuticals, LCC, when the company significantly increased the price of Daraprim, for which the company had obtained exclusive rights, from $13.50 to $750 per pill. On January 14, 2022, U.S. District Judge Cote ordered Mr. Shkreli to return $64.6 million in profits that he and his former company gained from raising the price of the lifesaving drug, and barred Mr. Shkreli from participating in the pharmaceutical industry for the rest of his life. (*See* Dkt. No. 20-cv-706 (DLC) (S.D.N.Y.), ECF No. 865, Opinion and Order, Jan. 14, 2022.)

prospective investors in MSMB; (2) lied to one of MSMB's executing brokers about MSMB's ability to settle short sales Shkreli had made in MSMB's account; (3) misappropriated funds from MSMB and MSMB Healthcare; and, (4) fraudulently induced Retrophin to enter into multiple sham consulting agreements with, and to issue stock and make cash payments to, certain disgruntled investors in MSMB and MSMB Healthcare in order to avoid liability. (Compl. ¶¶ 2-3, 24-55.)

The violative conduct alleged in the Complaint involved Mr. Shkreli taking a series of deliberate, calculated, and affirmative steps. As alleged in the Complaint, Mr. Shkreli knowingly or recklessly made repeated, blatant misrepresentations to current and prospective investors. (*Id.* ¶¶ 29-36.) For example, on July 26, 2010, Mr. Shkreli lied to a prospective investor ("Investor A") in MSMB by stating in an email that MSMB had generated gains of "+35.77% since inception on 11/1/2009," when MSMB had actually generated losses of about 18% during that time. (*Id.* ¶ 29.) Mr. Shkreli lied further to Investor A on December 2, 2010, when Mr. Shkreli wrote in an email that MSMB had assets in the amount of $35 million; in reality, at that time, MSMB had less than $1,000 across its bank and brokerage accounts. (*Id.* ¶¶ 30-31.) On December 2, 2010, Mr. Shkreli also falsely stated in an email to Investor A that MSMB had an auditor and

11

administrator when, in reality, MSMB had not retained either an auditor or administrator. (*Id.*)

Mr. Shkreli also made misrepresentations to an executing broker ("Executing Broker")[5] regarding MSMB's account. (*Id.* ¶¶ 19, 32-36.)  On February 1, 2011, Mr. Shkreli sold short more than 32 million shares of "Company A" in MSMB's account at Executing Broker, and represented to Executing Broker that MSMB had identified a source to borrow the Company A shares that MSMB was selling short.[6] (*Id.* at ¶¶ 32-33.)  There was no such source, as MSMB had not identified any source from which to borrow Company A shares. (*Id.* ¶ 34.)  Mr. Shkreli directly placed the orders for the short sales, and each transaction included a misrepresentation by Mr. Shkreli that MSMB was able to borrow sufficient Company A shares from the prime broker to settle the short sales executed by Executing Broker. (*Id.* ¶ 33.)  Mr. Shkreli continued to mislead Executing Broker regarding MSMB's ability to settle the short sales until February 2, 2011, and ultimately, MSMB failed to settle a short position of over 11 million shares of Company A. (*Id.* ¶¶ 35-36.)  Executing Broker bought sufficient shares of Company A on the market to settle MSMB's short position, incurring a loss of over $7 million. (*Id.* ¶ 36.)

---

[5] "Executing Broker" is identified as the registered broker-dealer Merrill Lynch in the SEC's Memorandum of Law. (ECF No. 48-2, p. 3.)

[6] "Company A" is identified as the issuer OREX in the SEC's Memorandum of Law. (ECF No. 48-2, p. 3.)

Mr. Shkreli's repeated, deliberate falsehoods to investors with regard to MSMB and MSMB Healthcare resulted in significant losses to hedge fund investors. The impacted investors in MSMB and MSMB Healthcare suffered these losses as Mr. Shkreli falsified the value and returns and dissipated the entire amounts invested in both funds through trading losses and misappropriations. (*Id.* ¶¶ 25-28.) During the period from October 2009 to January 2011, nine investors invested approximately $3,015,000 in MSMB. (*Id.* ¶ 24.) During that time period, Mr. Shkreli misappropriated approximately $120,000 of investor funds from MSMB for his personal benefit—including rent, food, medical expenses, and clothing—that were not properly charged as expenses of MSMB. (*Id.* ¶¶ 2-3, 28; Coppola Decl. ¶ 6.) By February 2011, Mr. Shkreli had dissipated nearly the entirety of MSMB funds through trading losses and misappropriations; the net asset value of MSMB's prime brokerage account and cash balance amounted to approximately $58,500. (Compl. ¶¶ 25-28, 44.) In early February 2011, despite knowing that MSMB had already lost nearly all its assets, Mr. Shkreli began emailing performance estimates to MSMB's investors, reporting profitable investments, reflecting outright lies. (*Id.* ¶ 42.) Mr. Shkreli continued emailing MSMB investors with deceptive performance estimates until September 2012. (*Id.*) In one example, on February 8, 2011, when MSMB had only $1.126 million remaining of more than $3 million originally invested, Mr.

13

Shkreli emailed at least five MSMB investors stating that MSMB had returned "+35.95 since inception on 11/1/2009." (*Id.* ¶ 43.) In another stark example, on March 2, 2011—again, by which point MSMB had virtually no assets left—Mr. Shkreli emailed MSMB investors falsely stating that MSMB had "returned +4.24% in February 2011" and "returned +41.71% since inception on 11/1/2009." (*Id.* ¶ 44.) Mr. Shkreli continued sending performance estimates to MSMB investors until September 2012, at which point he sent a final performance estimate to the limited partners stating that through June 2012 MSMB had returned "+79.49% net of fees since inception on 11/1/2009." (*Id.* at ¶ 45.) In contrast to Mr. Shkreli's fictional report to the investors, by the end of June 2012, MSMB had no assets left in its prime brokerage account or bank account. (*Id.*)

By September 2012, MSMB Healthcare's assets had also been dissipated, and consisted mainly of stock in the company Retrophin. (*Id.* ¶¶ 46-47.) From January through March 2013, Mr. Shkreli misappropriated approximately $900,000 of investor funds from MSMB Healthcare to pay a settlement agreement resulting from proceedings brought against Mr. Shkreli and MSMB by Executing Broker. (*Id.* ¶¶ 2-3, 37-41.) As alleged in the Complaint, as a result of Mr. Shkreli's conduct, MSMB suffered approximately $3 million of lost assets, and MSMB Healthcare at least $900,000. As alleged in the Complaint and as supported by the Coppola

14

Declaration, a total of $1,020,000 was misappropriated by Mr. Shkreli from MSMB and MSMB Healthcare, of which Mr. Shkreli directly misappropriated approximately $932,000 from December 18, 2010 to December 17, 2015.[7]  (Coppola Decl. ¶ 8.)

Mr. Shkreli then undertook further fraudulent conduct in order to absolve himself of potential claims from the disgruntled investors he left in his wake.  In September 2012, Mr. Shkreli notified investors in MSMB and MSMB Healthcare that he would be liquidating the hedge funds, and that investors could redeem their limited partnership for cash, Retrophin shares, or a combination of those two options, with distributions of cash and shares to be completed by October 31, 2012.  (Compl. ¶ 46.)  By that point, MSMB and MSMB Healthcare had nominal amounts of cash, and what few assets remained consisted primarily of Retrophin shares.  (*Id.* ¶ 47.)  Many limited partners were dissatisfied with the distribution they did receive, many others complained that they received incomplete information regarding the funds' asset composition, and at least one investor threatened legal action. (*Id.*)  During this time, Mr. Shkreli also issued a $250,000, note to a disgruntled investor in Elea Capital ("Elea"), a different

---

[7] In sentencing Mr. Shkreli in the parallel criminal proceeding related to the instant case, the Court determined that the two funds lost a combined total of $6,400,450.  (*See* Dkt. No. 15-cr-637, ECF No. 54, Memorandum and Order dated Mar. 5, 2018.)

hedge fund Mr. Shkreli had unsuccessfully operated during 2006 and
2007.  (*Id*. at ¶ 48.)

Faced with dissatisfied investors from all three
funds, Mr. Shkreli once again chose to commit another course of
fraudulent conduct.  In Mr. Shkreli's role as president and CEO of
the public company Retrophin, Mr. Shkreli, together with Mr.
Greebel, Retrophin's outside counsel and acting corporate
secretary, induced Retrophin to enter into sham consulting
agreements with investors in the MSMB-related and Elea hedge funds.
(*Id*. ¶¶ 46-51.)  These sham agreements provided for the use of
Retrophin funds and assets to resolve potential claims by MSMB and
Elea investors against Mr. Shkreli.  (*Id*. ¶¶ 2-3, 23, 46-55.)  Mr.
Shkreli did not disclose to Retrophin's Board of Directors that
the purpose of the agreements was to settle potential claims
brought against him or that consulting services were not actually
provided.  (*Id*.)  Ultimately, Mr. Shkreli caused Retrophin to
transfer approximately $7.5 million in cash and Retrophin stock
through the sham consulting agreements.  (*Id*. at ¶ 51.)

Accordingly, the Court finds that the violations by
Mr. Shkreli described in the Complaint rise to the level of
"egregious."  *See S.E.C. v. iShopNoMarkup.com, Inc.*, 2012 WL
716928, at *4 (citing *Save the World Air, Inc.*, 2005 WL 3077514 at
*16 (finding violations egregious when defendant engaged in a
scheme defrauding through material misstatements and omission of

16

material fact made to the investing public and related to the "very core" of the business); *see also SEC v. Robinson*, 2002 WL 1552049 at *5 (S.D.N.Y. July 16, 2002) (finding defendant made "flagrant" and "outrageous" misrepresentations to investors that his company had a product to market, ties to certain large telecommunications companies, and reasonable expectations of reaping billions of dollars in sales revenue). Mr. Shkreli told a series of flagrant, intentional falsehoods, including regarding the assets under management ("AUM"), misrepresenting that his struggling hedge funds were exceptionally successful, and hiding losses in order to manipulate individual and public investors for his benefit. *Cf. SEC v. Stanard*, 2009 WL 196023, at *33 (S.D.N.Y. Jan. 27, 2009) (finding no egregious violation when defendant's false accounting gave a "misleading impression" of the company's profits but did not "have the effect of creating false profits, hiding losses, or giving a misleading picture of [the company's] overall financial strength")). The Court finds that Mr. Shkreli's egregious violations of the securities laws at issue in this case support the imposition of an officer and director bar.

B. Defendant's "Repeat Offender" Status

In the Second Circuit, the term "repeat offender" refers to someone who has been found to have *previously* committed separate violations of securities laws. *See S.E.C. v. SeeThruEquity, LLC*, No. 18-cv-10374 (LLS), 2022 WL 171196, at *4 (S.D.N.Y. Jan. 19,

2022) (citing *S.E.C. v. Bankosky*, No. 12-cv-1012 (HB), 2012 WL 1849000, at *2 (S.D.N.Y. May 21, 2012), *aff'd*, 716 F.3d 45 (2d Cir. 2013)) ("the term 'repeat offender' does not, in cases in this Circuit, describe multiple violations as part of a unified scheme, but the recidivist who repeats the violation after prosecution for committing the earlier one."); *see also S.E.C. v. Dibella*, No. 04-cv-1342 (EBB), 2008 WL 6965807, at *11 (D. Conn. Mar. 13, 2008), *aff'd*, 587 F.3d 553 (2d Cir. 2009) (finding defendant was not a repeat offender because defendant was never found to have committed securities violations in prior roles as a director of two separate companies); *SEC v. Shah*, 1993 WL 288285, at *7 (S.D.N.Y. July 28, 1993) (finding defendant could not be considered a repeat securities law violator because he "was never involved in any other violations of the securities laws").

The SEC cites to authority from the Ninth and District of Columbia Circuits in support of the proposition that defendants are considered repeat offenders when they engage in "ongoing and recurrent violations." (ECF No. 48-2, SEC Mem. at p. 12 (citing *SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998); *SEC v. Falstaff Brewing Corp.*, 629 F.2d 62, 79 (D.C. Cir. 1980).) Though the Court agrees with the SEC that Mr. Shkreli's conduct was not isolated and involved multiple courses of fraudulent conduct over a period of more than four years, the Court cannot find that Mr. Shkreli is a "repeat offender" as the term is applied

in the Second Circuit.  It is undisputed that Mr. Shkreli, prior
to the events giving rise to the present litigation and related
criminal and civil actions,[8] had not been previously found to have
violated any securities laws.  *See Bankosky*, 2012 WL 1849000, at
*2 (quoting *iShopNoMarkup.com, Inc.*, 2012 WL 716928, at *5 (citing
Second  Circuit  cases)  (characterizing  a  repeat  offender  as
"someone who has committed separate violations of securities laws
in the past.")).  Accordingly, the Court does not consider Mr.
Shkreli a "repeat offender" under Second Circuit precedent, and
this factor weighs against the imposition of an officer director
bar.

C. Defendant's Role or Position During Fraud

It  is  undisputed  that,  during  the  securities  laws
violations alleged in the Complaint, Mr. Shkreli held high-level
roles as founder and manager of the hedge funds, and as founder
and CEO of Retrophin, the public company he defrauded or helped to
defraud.  Mr. Shkreli concedes that this factor does not weigh in
his favor.  (ECF No. 49, Def. Opp. Mem., pp. 7-8.)  Mr. Shkreli
was  the  founder,  managing  partner,  portfolio  manager,  and
investment adviser of both MSMB and MSMB Healthcare when he made
misrepresentations  to  investors,  potential  investors,  and  an

---

[8] Mr. Shkreli was convicted after trial of criminal conduct relating to
certain matters alleged in the instant action. In *United States v. Shkreli*,
15-cr-637-KAM (E.D.N.Y.), Mr. Shkreli was convicted of violations of Title
15, U.S.C., Sections 78j(b); and Title 18, U.S.C., Section 371.

executing broker regarding the composition and performance of the hedge funds. (Compl. ¶¶ 13, 17-18.)   Mr. Shkreli's hedge fund, Elea, was also operated by Mr. Shkreli in 2006 and 2007.  (*Id*. ¶ 23.)   Mr. Shkreli owed a fiduciary duty to his hedge fund investors.  (*Id*. ¶ 74 (noting that at all relevant times, Mr. Shkreli was an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11))); *see also SEC v Capital Gains Research Bureau, Inc*., 375 U.S. 180, 191-94 (1963) (noting fiduciary nature of an investment advisory relationship under Advisers Act).  Mr. Shkreli was also president and CEO of the public company, Retrophin, when he and Mr. Greebel engaged in the scheme to defraud Retrophin through sham consulting agreements.  (Compl. ¶¶ 13, 46-51.)   The Court finds that Mr. Shkreli's leadership positions and fiduciary roles during the securities violations described in the complaint support the imposition of an officer director bar.

   D. Defendant's Degree of Scienter

        The Court is satisfied that Mr. Shkreli's high degree of scienter regarding the violations in the complaint has been established by his underlying criminal conviction and sentencing. *See S.E.C. v. Gupta*, No. 11-cv-7566 (JSR), 2013 WL 3784138, at *4 (S.D.N.Y. July 17, 2013), *aff'd sub nom. U.S. S.E.C. v. Gupta*, 569 F. App'x 45 (2d Cir. 2014) (imposing a permanent injunction

prohibiting the defendant from serving as an officer or director of a public company, and noting as part of the court's *Patel* factors analysis that, in Mr. Gupta's criminal proceedings, the jury found that Mr. Gupta engaged in insider trading knowingly, willfully, and with intent to defraud). Mr. Shkreli concedes that his criminal conviction[9] has already established that he acted with a high degree of scienter as to certain allegations in the Complaint. (ECF No. 49, Def. Opp. Mem., pp. 7-8.) Mr. Shkreli's criminal conviction establishes Mr. Shkreli acted with scienter with respect to: (1) the material misrepresentations and/or omissions he made to investors of MSMB and MSMB Healthcare; and, (2) the misappropriation of funds from MSMB Healthcare to settle an arbitration against MSMB and Mr. Shkreli. (*Id.* at n. 4 (citing *United States v. Shkreli*, Dkt. No. 15-cr-637 (E.D.N.Y.).) Though Mr. Shkreli was acquitted, in relevant part to the instant action, of the conduct that he engaged in with Mr. Greebel to fraudulently induce Retrophin to enter into sham consulting agreements to steal money and shares from Retrophin to repay defrauded MSMB investors,

---

[9] (*See* Dkt. No. 15-cr-637, *United States v. Shkreli*, ECF No. 305, Verdict, at 1-3 (the jury returned its verdict on August 4, 2017, and Mr. Shkreli was convicted of Count Three, Securities Fraud in relation to MSMB Capital; Count Six, Securities Fraud in relation to MSMB Healthcare; and Count Eight, Conspiracy to Commit Securities Fraud in relation to Retrophin. Mr. Shkreli was acquitted on Count One, Conspiracy to Commit Securities Fraud with regard to the MSMB Scheme; Count Two, Conspiracy to Commit Wire Fraud with regard to the MSMB Scheme; Count Four, Conspiracy to Commit Securities Fraud with regard to the MSMB Healthcare Scheme; Count Five, Conspiracy to Commit Wire Fraud with regard to the MSMB Healthcare Scheme; and, Count Seven, Conspiracy to Commit Wire Fraud with regard to the Retrophin Misappropriation Scheme.)

the Court noted for the purposes of sentencing that the government had proven this conduct by a preponderance of the evidence. (*See* Dkt. No. 15-cr-637, *United States v. Shkreli*, ECF No. 89, Memorandum and Order Denying Def. Motion for Judgment of Acquittal, Feb. 26, 2018, at pp. 88-89.)

Even disregarding Mr. Shkreli's criminal conviction, the violations as described in the Complaint, which the Court accepts as true, and as discussed in detail *supra*, demonstrate that Mr. Shkreli was fully aware that he knowingly and intentionally was engaging in fraudulent conduct. "Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, or at least knowing misconduct." *See S.E.C. v. Bankosky*, No. 12-cv-1012 (HB), 2012 WL 1849000, at *2 (S.D.N.Y. May 21, 2012), *aff'd*, 716 F.3d 45 (2d Cir. 2013) (quoting *S.E.C. v. Kelly*, 765 F. Supp. 2d 301, 319 (S.D.N.Y.2011) (quoting *S.E.C. v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1467 (2d Cir.1996)). Employing the Second Circuit's definition, the Court considers Mr. Shkreli to have acted with a high degree of scienter in the commission of the violations alleged in the Complaint.

Mr. Shkreli knowingly and intentionally made numerous false statements to investors and brokers on numerous occasions concerning the two MSMB-related hedge funds, misappropriated investor funds which he obtained under false pretenses, and defrauded a public company into entering into sham consulting

agreements to protect himself from claims of the defrauded investors from his two hedge funds. Based on the record currently before the Court, it is clear to the Court that it was Mr. Shkreli's intent to manipulate and deceive individual and public investors. Though the Court considers that Mr. Shkreli acted with outright intent in his violation of multiple securities laws, scienter can also be "'satisfied by a strong showing of reckless disregard for the truth.'" *iShopNoMarkup.com, Inc.*, 2012 WL 716928, at *5 (citing *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 349 (S.D.N.Y. 2011) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir.2009)). "Conduct is reckless if it represents an extreme departure from the standards of ordinary care to the extent the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *iShopNoMarkup.com, Inc.*, 2012 WL 716928, at *5 (citing *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d at 349-50 (S.D.N.Y. 2011) (internal quotation marks omitted). Even if Mr. Shkreli did not act with knowledge and intent—which, based on the evidence, the Court finds to be established—the record supports a finding that at a minimum Mr. Shkreli acted with an "extreme departure from the standards of ordinary care." *Id*.

As described in the Complaint, Mr. Shkreli knowingly, or at the very least recklessly, used one entity after another to cover up the fraudulent conduct he committed at a different entity.

Mr. Shkreli's high degree of scienter weighs in favor of the imposition of an officer director bar.

E. Defendant's Economic Stake in the Violations

Mr. Shkreli's economic interest and the direct benefit he derived from committing the securities violations alleged in the Complaint weigh in favor of the imposition of an officer director bar. As alleged in the Complaint and as supported by the Coppola Declaration, Mr. Shkreli plainly profited from his securities laws violations. From October 2009 through July 2011, Mr. Shkreli misappropriated approximately $120,000 of investor funds from MSMB for his personal benefit. (Compl. ¶¶ 3, 28.) From January through March 2013, Mr. Shkreli misappropriated approximately $900,000 of investor funds from MSMB Healthcare to fund the settlement of an arbitration proceeding brought by Executing Broker in connection with MSMB's failure to settle its short sales of Company A stock—a failure orchestrated by Mr. Shkreli. (Compl. ¶¶ 3, 37-41; Coppola Decl. ¶¶ 5, 7.)

Mr. Shkreli does not dispute the SEC's argument, which is supported by the record, that Mr. Shkreli had an economic stake in the violations he committed. Logically, Mr. Shkreli stood to receive advisor fees from his hedge funds if he made it appear that the funds were profitable, rather than conceding the truth: that he had lost or spent all of the funds' assets. (Compl. ¶ 24-45.) Mr. Shkreli benefited from the misappropriations from MSMB

and MSMB Healthcare, which were used to fund the settlement with Executing Broker and ultimately protect Mr. Shkreli from potential claims arising from the $7 million loss Mr. Shkreli caused. (*Id.* ¶¶ 32-41.) Mr. Shkreli's purpose in inducing Retrophin, of which he was president and CEO, to enter into sham consulting agreements was to evade liability from his fraudulent conduct involving his hedge funds. (*Id.* ¶¶ 23, 46-55.)

### F. Likelihood of Recurrence

Though, as noted previously, the Court does not consider Mr. Shkreli to be a repeat offender, the Court finds that there is a likelihood of recurrence in Mr. Shkreli's case. Accordingly, the Court must and will "articulate the factual basis for a finding of the likelihood of recurrence[,]" in support of its conclusion. *S.E.C. v. Apuzzo*, 184 F. Supp. 3d at 9 (D. Conn. 2016) (citing *Patel*, 61 F.3d at 142).

In determining whether a "reasonable likelihood" of future violations exists, courts may generally consider:

> the egregiousness of the defendant's actions; the isolated, recurrent, or systematic nature of the violations; the degree of scienter involved; the [defendant's] recognition of the wrongfulness of the conduct; and the likelihood that the [defendant's] customary business activities will present opportunities for future violations.

*Commodity Futures Trading Comm'n v. McDonnell*, 332 F. Supp. 3d 641, 725 (E.D.N.Y. 2018) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)). As noted *supra*, the Court

has already found Mr. Shkreli's violative conduct at issue to be egregious, and to have been committed with a high degree of scienter.

As to the other factors, Mr. Shkreli's violations were certainly not isolated. Over a period of several years, from at least October 2009 through March 2014, Mr. Shkreli repeatedly committed violations of securities laws involving multiple entities. (Compl. ¶ 1.) Mr. Shkreli's actions, as the SEC aptly frames them, involved "different layers of misconduct," and involved interconnected acts of wrongdoing against different entities, "e.g., stealing from MSMB Healthcare to help pay his and MSMB's debts; stealing from Retrophin to help pay his hedge fund debts[.]" (ECF No. 48-2, SEC Mem., at p. 13.)

Having reviewed the record, the Court also concludes that Mr. Shkreli has demonstrated either an inability or an unwillingness to truly recognize the "wrongfulness" of his egregious violations of securities laws. *McDonnell*, 332 F. Supp. 3d at 725 (citing *Manor Nursing*, 458 F.2d at 1100-01). In the instant case, Mr. Shkreli focuses almost exclusively on the argument that he has already been sufficiently deterred and punished, and only once across his opposition and sur-reply to the SEC's Motion does he express that he has accepted responsibility for his actions. (ECF No. 49, Def. Opp. Mem., at p. 1.) Mr. Shkreli's opposition to the SEC's Motion states that he has

"accepted responsibility for his conduct in this action," by having
"consented to entry of Judgment permanently enjoining him from
future violations of the federal securities laws, waived his right
to appeal that judgment, and submitted himself to this Court's
determination as to...additional remedies[.]" (*Id.*) Contrary to
Mr. Shkreli's interpretation that the permanent injunction weighs
in his favor, the Court "has already determined in enjoining [Mr.
Shkreli] from future violations of the securities laws that there
is a likelihood that [Mr. Shkreli's] misconduct would recur absent
appropriate constraints." *Gupta*, 2013 WL 3784138, at *4.
Relatedly, as Mr. Shkreli notes, "following his conviction on
charges arising from much of the same conduct set forth in the
Complaint," this Court sentenced Mr. Shkreli on March 9, 2018, in
his parallel criminal proceeding to eighty-four months in prison
and three years of supervised release, along with forfeiture and
restitution. (ECF No. 49, Def. Opp. Mem., p. 4.) During the
sentencing over which this Court presided, the Court noted that
Mr. Shkreli's pre-sentencing letter reflected that he was
"generally remorseful for the betrayal of trust," that his acts
demonstrated. (Dkt. No. 15-cr-637, ECF No. 621, Hr. Tr. 112:8-
13.) The Court also noted that it must view Mr. Shkreli's
statements "in light of his other conduct and statements,"
including that Mr. Shkreli had "clearly and repeatedly minimized
his actions." (*Id.* at 112:18-22.) In his same pre-sentencing

27

letter to the Court, Mr. Shkreli did not admit to "his multitude of lies, but only that he dodged answering questions...exaggerated if he felt he had any basis...and provided answers that were only correct if put in a certain assumed context." (*Id.* at 112:22-113:1.)  The Court also reflected on the bevy of other conduct that "call[ed] into question the sincerity of his remorse in his letter to the Court" (*id.* at 114:7-8.), including Mr. Shkreli asserting that he would be sentenced to time served or serve only a few months in prison, and writing "fuck the Feds," in an email where he claimed the Government would not be able to take all his money. (*Id.* at 113:13-19.)

As to the likelihood that Mr. Shkreli's "customary business activities will present opportunities for future violations[,]" *McDonnell*, 332 F. Supp. 3d at 725 (citing *Manor Nursing*, 458 F.2d at 1100-01), the Court concludes that Mr. Shkreli's return to the world of investment and capital markets would be highly likely to present opportunities for future violations.[10]  A "district court may properly infer a likelihood of future violations from the defendant's past unlawful conduct." *McDonnell*, 332 F. Supp. 3d at 725 (citing *CFTC v. Am. Bd. of Trade,*

---

[10] The Court takes judicial notice that as part of the aforementioned proceedings in *FTC v. Vyera Pharm., LLC*, Dkt. No. 20-cv-706 (DLC) (S.D.N.Y.), Mr. Shkreli has been found to have used a contraband phone ("Prison Phone") while incarcerated pursuant to this Court's sentence in order to continue to remain involved in Vyera's business development from prison. *FTC v. Vyera Pharms., LLC*, No. 20-cv-706 (DLC), 2021 WL 2201382, at *3 (S.D.N.Y. June 1, 2021). Incarceration has apparently not deterred Mr. Shkreli from continuing to participate in his prior business ventures.

*Inc.*, 803 F.2d 1242, 1251 (2d Cir. 1986).  Mr. Shkreli's past unlawful conduct, which has shown a manifest disregard for the investing public, regulatory mechanisms, and this country's securities laws, reasonably leads this Court to infer there is a likelihood of future violations.

\*\*\*

The Court concludes, based on a review of the record and an analysis of the *Patel* factors, that Mr. Shkreli is unfit to serve as an officer or director of any public company.  The Court next considers whether Mr. Shkreli should be permanently barred from serving as an officer or director of any publicly traded company, or whether a less onerous, alternative bar or conditions will suffice.

## II.  <u>Permanent Bar</u>[11]

---

[11] The Court notes that Mr. Shkreli argues, in opposition to the imposition of a permanent bar, that other courts have imposed officer director bars limited in duration against more culpable or comparable defendants.  (*See* ECF No. 49, Def. Opp. Mem., pp. 8-15 (citing to ECF No. 9, Final Judgment, *SEC v. Holmes*, No. 18-cv-1602 (N.D. Cal. Mar. 27, 2018); ECF No. 87, Final Judgment, *S.E.C. v. DiMaria*, 15-cv-7035 (S.D.N.Y. Aug. 16, 2017); ECF No. 43, Final Judgment, *S.E.C. v. Earls*, No. 02-cv-02495 (D.D.C. Jun. 13, 2011); *S.E.C. v. Chan*, 465 F. Supp. 3d 18 (D. Mass. 2020)).)  Though the SEC overstates the irrelevance of these four cases, the Court notes the difference in procedural posture.  The courts in each of the first four cases entered final judgments at the SEC's request and with the consent of the defendants as part of settlements between the parties.  Therefore, the Court does not find persuasive Mr. Shkreli's reliance on these cases with regard to the Court's determination of the appropriateness of a permanent officer or director bar for Mr. Shkreli using the *Patel* factors. As to *Chan*, 465 F. Supp. 3d 18, which also did not apply the *Patel* factors and in which a five-year bar was imposed, the Court notes that Mr. Chan was not an officer of the involved company—in sharp contrast to Mr. Shkreli—and had only a modest economic stake in the fraud at issue. *Chan*, 465 F. Supp. 3d at 38.

Prior to "imposing a permanent bar, the court should consider whether a conditional bar (e.g., a bar limited to a particular industry) and/or a bar limited in time (e.g., a bar of five years) might be sufficient, especially where there is no prior history of unfitness." *Patel*, 61 F.3d at 142. Mr. Shkreli argues that a permanent bar is excessive because it would be exceedingly punitive, given his young age, the fact that he is a first-time offender, and "all the other punitive and deterrent sanctions" imposed against him. (ECF No. 49, Def. Opp. Mem., at p. 1.)

In determining whether a conditional bar or a bar of limited duration is sufficient, the Second Circuit instructs that it would not be "improper for the district court to take into account any prior punishment that may have been imposed in a criminal proceeding." *Patel*, 61 F.3d at 142. The Court has, therefore, taken into account Mr. Shkreli's prior criminal conviction in his parallel criminal proceedings—the only criminal conviction Mr. Shkreli faced prior to the filing of the instant action. Notably, however, the jury convicted Mr. Shkreli on three counts of the eight-count indictment, and the Court found for sentencing purposes that as to the other five counts, the government had successfully proven Mr. Shkreli's conduct by a preponderance of the evidence. (*See* Dkt. No. 15-cr-637, *United States v. Shkreli*, ECF No. 305, Verdict, at 1-3.)

30

Even given Mr. Shkreli's status as a first-time offender, the Court has found that every other *Patel* factor weighs in favor of the imposition of a permanent officer director bar. Based on a review of the record, Mr. Shkreli's prior criminal conviction, and the weight of the majority of the factors in the Court's *Patel* analysis, the Court concludes that Mr. Shkreli is permanently unfit to serve as the officer or director of any public company. As reflected in the Complaint, Mr. Shkreli consistently and brazenly deceived his investors, acting as a chaotic, dishonest, and untrustworthy corporate leader in his role as a fiduciary and as the president and CEO of a public company. Mr. Shkreli's relatively young age is also concerning to the Court, because a limited bar of five or ten years, for example, would not sufficiently protect the public from Mr. Shkreli's likelihood of future violations. Mr. Shkreli's conduct demonstrates a persistent, prevailing inclination to place his own "self-interest ahead of" the interests of his investors, hedge funds, and the public companies under his control, "and further demonstrates unfitness to serve as a corporate fiduciary." *Gupta*, 2013 WL 3784138, at *4 (citing *Bankosky*, 2013 WL 1955809, at *4). The imposition of a lifetime bar in Mr. Shkreli's case is in the interest of the investing public.

### III. **Civil Monetary Penalties**[12]

 The SEC argues that, in addition to the imposition of
a permanent bar from serving as an officer or director, the
imposition of monetary penalties in the amount of $1,392,000 is
appropriate.  (ECF No. 48-2, SEC Mem., p. 14.)  Mr. Shkreli
argues in opposition that a civil penalty in not appropriate
given the sanctions already imposed on Mr. Shkreli, and in the
event that one is imposed, only second tier penalties should
apply.  (ECF No. 49, Def. Opp. Mem., p. 17.)  The Court agrees
with the SEC that third tier penalties are appropriate.

 **A. Statutory Requirements**

 First, the SEC's requested civil monetary penalties
comply with the relevant statutory requirements and relevant
statutory maximums.  Pursuant to the relevant statutes, third
tier penalties may be imposed if the violation involves "fraud,
deceit, manipulation, or deliberate or reckless disregard of a
regulatory requirement," and if the violation also resulted in
"substantial losses or created a significant risk of substantial
losses to other persons."  *See* 15 U.S.C. § 77t(d); 15 U.S.C. §
78u(d)(3); 15 U.S.C. § 80b-9(e).  The Court, based on its
detailed consideration of the relevant facts *supra*, finds that
all of Mr. Shkreli's violations included fraud, deceit,

---

[12] The SEC has not moved for disgorgement.

manipulation, or a deliberate or reckless disregard of a
regulatory requirement, and also resulted in substantial losses
or created significant risks of substantial losses to other
persons. *Id.*; (*see also* generally Compl. ¶¶ 1-55.)

The statutes provide that, for all three tiers, the
amount of the penalty that the Court can impose, per violation,
"shall not exceed the greater of" the current statutory amount
in effect at the time of the violation, or the "gross amount of
pecuniary gain to such defendant." *Id.* (emphasis added.)  The
SEC's request for an imposition of $1,392,000 in civil monetary
penalties is comprised of: (1) $932,000, the amount of Mr.
Shkreli's gross pecuniary gain from his misappropriations from
MSMB and MSMB Healthcare; and, (2) $460,000, representing one-
time, third tier penalties for each of his three additional,
separate securities violations, *i.e.*, misrepresentations to MSMB
investors ($150,000 penalty), misrepresentations to Executing
Broker ($150,000 penalty), and defrauding Retrophin ($160,000
penalty). (ECF No. 48-2, SEC Mem., p. 14.)[13]  All components of

---

[13] These amounts accurately reflect the inflation-adjusted statutory maximum
penalty amounts for violations occurring from March 4, 2009 through March 5,
2013, adjusted again for violations occurring March 6, 2013 through November
2, 2015. *See* Adjustments to Civil Monetary Penalty Amounts, Release
Nos. 33-9009, 34-59449, IA-2845, dated Feb. 25, 2009 (effective Mar. 3,
2009), previously found at 17 CFR 201.1004 and Table IV to Subpart E of Part
201 (available at: https://www.sec.gov/rules/final/2009/33-9009.pdf) and
Release Nos. 33-9387, 34-68994, IA-3557, dated Feb. 27, 2013 (effective Mar.
5, 2013), previously found at 17 CFR 201.1005 and Table V to Subpart E of
Part 201 (available at: https://www.sec.gov/rules/final/2013/33-9387.pdf).
During the period (*see* Compl. ¶¶ 24-41, describing appropriate time period as
approximately from October 2009 to March 2013), Mr. Shkreli engaged in

the SEC's requested total civil monetary penalties comply with the statutory maximums.

Having determined that the requested third tier civil monetary penalties comply with the relevant statutory requirements and statutory maximums, the Court next turns to determine whether these civil penalties should be imposed. *See S.E.C. v. Razmilovic*, 738 F.3d 14, 38 (2d Cir. 2013), *as amended* (Nov. 26, 2013) ("Beyond setting maximum penalties, the statutes leave the actual amount of the penalty ... up to the discretion of the district court.") (quotation omitted); *see also* 15 U.S.C. §§ 77t(d)(2)(A) ("The amount of the penalty shall be determined by the court in light of the facts and circumstances."); 78u(d)(3)(B)(i) (same); 80b-9(e)(2)(A) (same).

## B. Imposition of Civil Monetary Penalties

In considering whether civil penalties should be imposed and the amount of any such penalties, courts in the Second Circuit look to a number of factors, including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be

---

violations involving misappropriations from MSMB and misrepresentations to MSMB and Executing Broker, the statutory amounts for penalties for natural persons were $7,500 for first tier, $75,000 for second tier, and $150,000 for third tier. *See id.* During the period Mr. Shkreli engaged in violations involving Retrophin (*see* Compl. ¶ 3(e), describing appropriate time period as approximately from September 2013 to March 2014), the statutory amounts for penalties for natural persons were $7,500 for first tier, $80,000 for second tier, and $160,000 for third tier. *See id.*

> reduced due to the defendant's demonstrated current
> and future financial condition.

*S.E.C. v. Fowler*, 6 F.4th 255, 266 (2d Cir. 2021), *cert. denied*,

142 S. Ct. 590 (2021). *SEC v. Rajaratnam*, 918 F.3d 36, 44 (2d

Cir. 2019).  The Court, in its detailed *Patel* factors analysis

*supra*, has already made findings as to relevant factors one

through four for determining an appropriate civil monetary

penalty.  Specifically, the Court has determined that (1) Mr.

Shkreli's conduct was egregious; (2) Mr. Shkreli acted with a

high degree of scienter in the commission of his violations; (3)

Mr. Shkreli's conduct created substantial losses and the risk of

substantial losses to others; and, (4) Mr. Shkreli's conduct was

recurrent. *See Fowler*, 6 F.4th at 266.  The Court next considers

whether the third tier penalty should be reduced by one level

due to Mr. Shkreli's demonstrated current and future financial

condition.

The record, however, does not reflect that Mr. Shkreli

faces present or future financial circumstances that would

warrant a reduction from third to second tier penalties.  Mr.

Shkreli has not submitted any evidence demonstrating an

inability to pay a civil monetary penalty imposed by the Court.

Mr. Shkreli appears to argue in this regard that the economic

ramifications (the forfeiture, restitution, and fine) of his

criminal conviction and sentencing have sufficiently cost and

punished him, which should preclude the imposition of any further civil penalties.  (ECF No. 49, Def. Opp. Mem. pp. 19-20; ECF No. 53, Def. Sur-Reply, pp. 1-2.)  As part of his criminal sentencing, Mr. Shkreli has been Ordered to forfeit $7,360,450 (reflecting the moneys invested by MSMB and MSMB Healthcare investors), pay a fine of $75,000, and pay mandatory restitution in the amount of $388,336.49 to one investor in MSMB Healthcare. (Dkt. No. 15-cr-637, *United States v. Shkreli*, ECF No. 565, Sentencing Order; Dkt. No. 15-cr-637, *United States v. Shkreli*, Dkt. Order Apr. 9, 2018, Restitution Order.)  The Court cannot find, based on Mr. Shkreli's unsubstantiated arguments, that his financial circumstances, due to his criminal financial penalties and his income lost while incarcerated, warrant a reduction of a third tier civil monetary penalty.  *Cf. U.S. S.E.C. v. Syndicated Food Serv. Int'l, Inc.*, No. 04-cv-1303 (NGG) (VMS), 2014 WL 2884578, at *20 (E.D.N.Y. Feb. 14, 2014), *report and recommendation adopted*, No. 04-cv-1303 (NGG) (VLS), 2014 WL 1311442 (E.D.N.Y. Mar. 28, 2014) (bringing defendant down one tier, taking into account defendant's present and likely severe health, family and financial circumstances.).

This Court has broad discretion to impose the civil monetary penalties it deems appropriate in the instant case. *See S.E.C. v. de Maison*, No. 18-2564, 2021 WL 5936385, at *1 (2d Cir. Dec. 16, 2021) (quoting *SEC v. Fowler*, 6 F.4th 255, 265 (2d

Cir. 2021)) (quoting *SEC v. Sourlis*, 851 F.3d 139, 146 (2d Cir. 2016)) ("[O]nce the district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies.").  As Mr. Shkreli correctly points out, "[c]ivil monetary penalties are authorized by the Securities Act and the Exchange Act for both deterrent and punitive purposes." *See S.E.C. v. Sourlis*, 851 F.3d 139, 146 (2d Cir. 2016) (citing *Razmilovic*, 738 F.3d 14, 38-39 (2d Cir. 2013)).  Given (1) the egregiousness of Mr. Shkreli's conduct in misappropriating investors' funds from MSMB and MSMB Healthcare, making flagrant misrepresentations to MSMB investors and Executing Broker, and defrauding Retrophin; (2) the high degree of scienter with which Mr. Shkreli acted in committing those egregious violations; (3) the substantial losses and risk of substantial losses to other persons created by Mr. Shkreli's misappropriations and misrepresentations; (4) the  recurrent nature of Mr. Shkreli's misconduct; and, (5) the lack of evidence demonstrating that the monetary penalties should be reduced due to Mr. Shkreli's current and future financial condition, the Court concludes that third tier penalties are appropriate in the instant case, both as punishment for Mr. Shkreli and for their deterrent effect. The Court will impose third tier civil monetary penalties as to Mr. Shkreli, in the total amount of $1,392,000.00, for the following: (1) $932,000, the amount of Mr. Shkreli's gross

pecuniary gain from his misappropriations from MSMB and MSMB Healthcare; and, (2) $460,000, representing one-time, third tier penalties for each of his three additional, separate securities violations, i.e., misrepresentations to MSMB investors ($150,000 penalty), misrepresentations to Executing Broker ($150,000 penalty), and defrauding Retrophin ($160,000 penalty). (ECF No. 48-2, SEC Mem., p. 14.)

## CONCLUSION

Accordingly, and for all the foregoing reasons, the Court GRANTS the SEC's Motion for a permanent Officer and Director Bar and Civil Monetary Penalties in its entirety. (ECF No. 48-1.) As reflected in the accompanying Final Judgment ("Judgment") as to Defendant Martin Shkreli, the Court permanently bars Mr. Shkreli from serving as an officer or director of any public company, and further imposes civil monetary penalties of $1,392,000.00, against him. As reflected in the Judgment, the SEC has withdrawn its claims for disgorgement and prejudgment interest. The Clerk of Court is respectfully ordered to enter the Judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. The Court shall retain jurisdiction of this matter

solely for the purposes of enforcing the terms of the Judgment.


**SO ORDERED.**

Dated:    February 23, 2022
          Brooklyn, New York

                                _____/s/_____
                                Kiyo A. Matsumoto
                                United States District Judge